968 F.2d 1212
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alan Bradley HALE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Harold O'Neal NICHOLSON, Defendant-Appellant.
 Nos. 91-5597, 91-5609.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 7, 1992
Decided: July 15, 1992
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior District Judge. (CR-91-13-A)
 Argued: David William O'Brien, Bonner & O'Connell, Washington, D.C., for Appellants.
 Mark Joseph Hulkower, Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 On Brief: Leonard R. Piotrowski, Fairfax, Virginia, for Appellant Nicholson. Richard Cullen, United States Attorney, W. Neil Hammerstrom, Jr., Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before MURNAGHAN and HAMILTON, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 I.
 
 1
 The defendants were tried before a jury in the United States District Court for the Eastern District of Virginia, where each was convicted of conspiracy to transport in interstate commerce automobiles taken by fraud, in violation of 18 U.S.C. § 2314. Following the imposition of sentences, including terms of imprisonment, the defendants appeal alleging numerous errors by the district court. Finding no merit in the defendants' claims, we affirm their convictions and sentences.
 
 II.
 
 2
 The government presented evidence at trial that from on or about May 17, 1989, to on or about November 21, 1989, Alan Bradley Hale and his brother-in-law Harold O'Neal Nicholson, conspired with automobile wholesalers David Jewell and John Cox to transport over $250,000.00 in fraudulently obtained automobiles between Virginia, Maryland, and Alabama. Hale's and Nicholson's part in the conspiracy was to sell Virginia and Maryland vehicles in Alabama, using fraudulent certificates of title supplied by Jewell and Cox.
 
 
 3
 The scheme originated in the spring of 1989 during a meeting between Jewell, Cox, and Nicholson in Laurel, Maryland. At this meeting, Nicholson said he would sell all of the fraudulently obtained cars that Jewell and Cox could bring down to him in Alabama. Consequently, Jewell and Cox set their plan in motion by stealing a 1988 Jeep Cherokee, which Cox had previously owned, from the lot of Manhattan Leasing in Fairfax, Virginia. They were able to drive the Jeep off the lot by using keys that had been made from "key code numbers" obtained from documents Cox had when he owned the vehicle. Before taking the Jeep, however, Jewell and Cox fraudulently obtained a certificate of title to the vehicle from the Virginia Department of Motor Vehicles ("DMV") to effect an ostensibly lawful sale in Alabama. A contact in Washington D.C. supplied them with false certificates of title. Cox then went to the DMV in Virginia, said that he had recently moved into the state from D.C., and was issued a new title which appeared to be valid.
 
 
 4
 Jewell and Cox then transported the Jeep with the fraudulent title to Nicholson in Alabama, where it was shown to a prospective buyer by Hale. Hale was instructed to tell the buyer that he represented the owner of the vehicle, one Andrew Glasgow, whose name had been forged onto the title by Cox in Hale's presence. Hale was further instructed that he was to accept only cash for the vehicle, in order to avoid any paper trail to the transaction.
 
 
 5
 At Hale's first meeting with the buyer, and with Hale's knowledge, Jewell and Cox arranged to follow Hale in a white Jaguar,[1] which they parked at a safe distance in order to observe the transaction without being seen. Hale was instructed not to allow the buyer to see either them or the Jaguar. This sale was eventually completed for $11,200.00 in cash, which Hale turned over to Jewell, minus his share of the proceeds.
 
 
 6
 Meanwhile, Jewell and Cox had ongoing discussions with Nicholson about their plan to use "sight drafts" in order to obtain automobiles from various dealerships in the Washington, D.C. area. In September and October 1989, Jewell, with the assistance of Cox, visited two car dealerships in Virginia and one in Maryland to arrange the purchase of a total of 14 expensive cars. Jewell negotiated a price for each car and issued a promissory note commonly known as a "sight draft" to the dealer, promising to return at a later date with the agreed upon payment. As is customary in the used car business, the dealerships retained the titles for the cars, which they were to relinquish to Jewell when he returned with the money.
 
 
 7
 In fact, Jewell never intended to redeem the sight drafts and once he obtained the automobiles, he never returned to make payment. Instead, Jewell and Cox fraudulently retitled five of the automobiles and used these false titles to resell them to other dealers. They transported at least four of the other automobiles from Maryland to Alabama, where Nicholson and Hale planned to sell them using false titles Jewell and Cox hoped to obtain. Jewell told Nicholson that he had no intention of returning to the dealerships to pay for the automobiles. There was also a clear understanding that Nicholson and Hale would be selling the cars with false titles. When Jewell learned that he could no longer obtain false titles from his usual source, he discussed options with Nicholson and Hale for obtaining new titles in Alabama or Mississippi. Another alternative discussed was having Cox print titles on a Xerox copier.
 
 
 8
 On November 20, 1989, Jewell and Hale attended a birthday party in Alabama at a mobile home owned by Nicholson's son. They arrived in a white Corvette, which Jewell had taken from Criswell Chevrolet in Gaithersburg, Maryland. After the police were observed heading in the direction of the mobile home, Jewell ran out the back door and hid in an adjacent field. When the police arrived and began questioning people at the party, Hale told a friend,"Don't say anything. Don't tell them anything." Hale told an FBI agent who had accompanied the police that he hadn't seen Jewell that evening. The police confiscated the Corvette driven by Jewell and Hale, along with another Criswell Corvette which was parked on the property.
 
 
 9
 Later that same night, Hale helped Jewell elude the police by driving him to Mississippi, where they spent the night in a hotel. The next day they traveled to Tennessee and on to Kentucky, where Hale rented a car for Jewell to continue his flight.
 
 
 10
 The day after the stolen cars were recovered at the mobile home, Nicholson told an FBI agent that he had not given Jewell permission to keep the cars on his property nor was he involved in helping Jewell sell automobiles. At trial, he admitted that he had tried to help Jewell sell some of the cars. However, both Nicholson and Hale maintained at trial that they did not know the vehicles which they stored and attempted to sell were stolen.
 
 III.
 
 11
 The defendants argue that the district court erred in allowing the government to introduce at trial evidence of the Jeep and the white Jaguar because these two vehicles were "stolen" rather than "obtained by fraud."
 
 
 12
 The indictment charges the defendants with conspiring to violate 18 U.S.C. § 2314, which states in relevant part that:
 
 
 13
 Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 
 
 14
 The specific language used in the indictment charges that the defendants conspired to transport in interstate commerce "automobiles, knowing the same to have been taken by fraud, in violation of Title 18, United States Code, Section 2314." The defendants argue that by using the words "taken by fraud" and omitting the word "stolen," that the indictment narrowed the scope of conduct covered by the statute. The defendants contend that the conspiracy encompassed only those cars taken by fraud, not those which were stolen. Further, since evidence of two cars which were stolen rather than fraudulently obtained was allowed, the court in effect impermissibly broadened the scope of the indictment, thereby committing reversible error. Thus, the defendants are arguing essentially that there was a fatal variance between the offense charged and the proof offered at trial.
 
 
 15
 The variance argument is unpersuasive, however, because there was sufficient evidence introduced at trial to support the district court's conclusion that the taking of these two vehicles was accomplished, in part at least, through fraud and in furtherance of the overall fraudulent scheme. The disposition of both vehicles was facilitated by the use of fraudulent certificates of title, without which they could not have been readily resold to unsuspecting purchasers, as were the other automobiles involved in the conspiracy. Viewed in the light most favorable to the government, there was sufficient evidence from which a rational jury could find that these two vehicles were obtained by fraud. Thus, the district court's decision to allow that evidence to be presented to the jury was not reversible error.[2]
 
 IV.
 
 16
 The defendants contend that the district court erred in ruling that automobiles are goods and merchandise under 18 U.S.C. § 2314 and that it was improper for the government not to prosecute the case under 18 U.S.C. § 2312, which specifically applies to stolen motor vehicles and carries a less severe maximum penalty.[3] Both parts of this argument apparently rest on the assumption that because Congress provided two different statutes which punish interstate transportation of stolen property, and one of them is confined to stolen automobiles and aircraft, that the two must be mutually exclusive. In other words, "goods" and "merchandise" under § 2314 must not include automobiles because the interstate transportation of stolen automobiles is punishable under § 2312. This assumption is without merit. The interstate transportation of stolen automobiles or aircraft may be prosecuted under either § 2312 or § 2314. The existence of a more narrowly tailored statutory violation does not prevent prosecution under a broader statute, so long as the defendant is not punished under both statutes for the same conduct. See, e.g., United States v. Ogden, 703 F.2d 629 (1st Cir. 1983); United States v. Grenagle, 588 F.2d 87 (4th Cir.), cert. denied, 440 U.S. 927 (1979).
 
 V.
 
 17
 The defendants claim that the district court erred in instructing the jury that it could consider their conscious avoidance or willful blindness with respect to the object of the conspiracy. However, it is well settled that a court can instruct a jury on the question of conscious avoidance in a conspiracy prosecution. There are two aspects of knowledge in a conspiracy: (1) knowing participation or membership in the alleged conspiracy, and (2) knowledge of the unlawful aims or objects of the conspiracy. See United States v. Heinemann, 801 F.2d 86, 93 (2nd Cir. 1986); United States v. Lanza, 790 F.2d 1015, 1022 (2nd Cir.), cert. denied, 479 U.S. 861 (1986). While conscious avoidance may not be used to establish knowing participation in the conspiracy, it may be used to establish "some knowledge of the unlawful aims and objectives of the scheme." Lanza, supra, at 1022. "Thus, even in a conspiracy case, in which specific intent must be proven, use of a conscious avoidance instruction may be appropriate with respect to the defendant's knowledge of the objectives of the conspiracy." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1195 (2nd Cir. 1989); see also United States v. Joyce, 542 F.2d 158, 161 (2nd Cir. 1977) (conscious avoidance instruction proper where defendants claimed ignorance of the fact that property was stolen).
 
 
 18
 In this case, the defendants claimed ignorance of the object of the enterprise, namely the interstate transportation of stolen automobiles. They admitted helping Jewell and Cox store and sell cars which had moved in interstate commerce, but they denied knowing that the cars were stolen. The court was careful to instruct the jury as to the elements of conspiracy and that actual knowledge and specific intent were required to prove the defendants' membership therein. Only then did the court discuss knowledge of the object of the conspiracy. On the facts of this case, this charge was proper. The instruction went to the defendants' knowledge of the unlawfulness of the scheme, not to their intent to join it and there is evidence in the record from which a rational jury could make such a finding.
 
 VI.
 
 19
 The defendants contend that the district court erred in failing to give them a three level reduction under the sentencing guidelines. Where all the acts necessary to complete a conspiracy have not occurred, U.S.S.G. § 2X1.1(b)(2) authorizes a three level reduction.[4] United States v. DePew, 932 F.2d 324, 330 (4th Cir. 1991). The defendants argue that the stated objective of the conspiracy was to transport cars which had been fraudulently obtained in the Washington D.C. area to Alabama. They further contend that because only four of the cars were actually transported to Alabama, only part of the conspiracy was completed. Thus, they argue that their offense level should have been calculated by determining the value of all the cars stolen, minus three levels, or by the value of the four cars which were transported to Alabama, whichever is greater.
 
 
 20
 This claim is not persuasive for at least two reasons. First, the indictment simply charged the defendants with conspiracy to transport stolen cars in interstate commerce. Of the 15 automobiles described in the Overt Acts section of the indictment, 11 of them were transported in interstate commerce. It was not necessary to show that the cars arrived at any particular destination in order to prove a violation of the statute. The conspiracy was substantially completed for guideline purposes and no reduction was warranted. Second, the court found that the extent to which other cars did not make it down to Alabama was due to the intervention of the FBI and that it was clearly foreseeable that at least $200,000.00 worth of cars was involved. Thus, even if the conspiracy were ongoing, it was terminated only because of the intervention of the authorities, making the defendants ineligible for a three level reduction.
 
 
 21
 Application of the sentencing guidelines is reviewed under the clearly erroneous standard. See United States v. Barsanti, 943 F.2d 428, 432 (4th Cir. 1991). Because there is evidence in the record to support this finding, the court was not clearly erroneous in concluding that the defendants were not entitled to a three level reduction.
 
 VII.
 
 22
 Finally, Hale contends that the district court erred in enhancing his guideline level by two pursuant to U.S.S.G. § 3C1.1 for obstruction of justice.[5] This, too, is a factual determination, which should not be disturbed on appeal unless clearly erroneous. There is clear evidence that Hale assisted Jewell to escape from the FBI by lying about his whereabouts and by driving Jewell to another state to avoid apprehension. Purposely concealing the target of a federal investigation and aiding his flight from the authorities, do constitute obstruction of justice. This finding of the district court is not clearly erroneous.
 
 
 23
 Accordingly, the convictions and sentences are
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 The Jaguar had previously been taken from a parking lot in Vienna, Virginia by Jewell and Cox as part of a pre-arranged plan with the owner of the car to enable him to fraudulently collect money from his insurance company by reporting the car as stolen. Jewell and Cox then delivered the car, with a false title, to Nicholson and Hale in Alabama for resale. However, the car was confiscated by the police when Nicholson gave it to a friend, who in 6350 35 6 turn attempted to use it as security for a bank loan
 
 
 [2]
 The defendants also complain that the Jaguar was not listed in the indictment. This complaint is without merit. If the existence of a conspiracy is established, there is no requirement that every overt act done in furtherance of that conspiracy be alleged in the indictment. Moreover, the indictment itself states that the defendants "performed the following overt acts, and others ...." (Emphasis added.)
 
 
 [3]
 Under § 2312, a defendant may be fined not more than $5000 or imprisoned not more than five years, or both. Under § 2314, a defendant may be fined not more than $10,000 or imprisoned for not more than ten years, or both. It should be noted that both defendants were sentenced to prison terms well below the maximum term of five years that could have been imposed for a conviction under § 2312. It is, therefore, difficult to understand what harm is supposed to have been done to the defendants by being prosecuted under § 2314
 
 
 [4]
 Section 2X1.1(b)(2) states that,"If a conspiracy, decrease by (3) levels, unless the defendant or co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control."
 
 
 [5]
 Section 3C1.1 states: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."